**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division**

| | |
|---|---|
| **KENSIL WILLIAMS**<br>**401 West Redwood St**<br>**# 702**<br>**Baltimore MD 21201,**<br><br>    **Plaintiff,**<br><br>    **v.**<br><br>**ELLICOTT DREDGES, LLC**<br>**1611 Bush Street,**<br>**Baltimore, Maryland 21230**<br> **and**<br>**MARKEL CORPORATION**<br>**4521 Highwoods Parkway,**<br>**Glen Allen, VA 23060**<br>**And**<br>**MARKEL VENTURES, INC.**<br>**4521 Highwoods Parkway,**<br>**Glen Allen, VA 23060**<br><br>    **Defendants.** | **Civil Action No._____**<br><br><br><br><br><br><br><br><br><br><br><br><br><br>**JURY DEMAND** |

**COMPLAINT FOR DECLARATORY AND MONETARY RELIEF**

Plaintiff Kensil Williams, by and through her undersigned counsel, hereby files this action

for equitable and monetary relief against Defendants Ellicott Dredges, LLC,  Markel Corporation,

and Markel Ventures, Inc. for harassment and discrimination based on sex, race, and reprisal in

violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and

for harassment and discrimination based on sex, race, and reprisal in violation of the Baltimore

County Code § 29-1-101 *et. seq.*, and the Maryland Fair Employment Practices Act ("MFEPA"),

Md. Code Ann., State Gov't § 20-601 *et seq.*

**JURISDICTION**

1.      This Court maintains subject matter jurisdiction over Ms. Williams's claims pursuant to 42 U.S.C. § 1988(a) and 28 U.S.C. § 1331, because this action addresses the vindication of her civil rights and contains a federal question, as it arises under the laws of the United States, specifically Title VII.

2.      This Court maintains supplemental jurisdiction over Ms. Williams's claims arising under the laws of Maryland pursuant to 28 U.S.C. § 1367(a) because those claims are part of the same case or controversy as those arising under Title VII.

3.      This Court maintains personal jurisdiction over Defendant Ellicott Dredges, LLC, ("Ellicott") because Ellicott, at all times relevant to this Complaint, purposefully availed itself of the privilege of conducting employment activities within the state of Maryland, is currently registered to do business in the state of Maryland, and carried out its acts and omissions alleged herein in the state of Maryland. Ellicott maintains its headquarters at 1611 Bush Street, Baltimore, Maryland 21230 and, at all times material to this Complaint, conducted and maintained operations in Baltimore, Maryland.

4.      At all times material to this Complaint, Ellicott employed more than 200 employees and engaged in an "industry affecting commerce" within the meaning of 42 U.S.C. §§ 2000e(b) and (h).

5.      This Court maintains personal jurisdiction over Defendant Markel Corporation ("Markel Corporation") because Markel Corporation, at all times relevant to this Complaint, purposefully availed itself of the privilege of conducting employment activities within the state of Maryland. Markel Corporation is a corporation incorporated in the state of Virginia, and at all times material to this Complaint, operated Ellicott Dredges in Baltimore, Maryland. Markel

maintains its headquarters at 4521 Highwoods Parkway, Glen Allen, VA 23060 and, at all times material to this Complaint, conducted and maintained operations in Baltimore, Maryland. Upon information and belief, there is a corporate relationship between Ellicott and Markel Corporation.

6.     This Court maintains personal jurisdiction over Defendant Markel Ventures Inc., ("Markel Ventures") because Markel Ventures, owned by Markel Corporation (collectively, "Markel Defendants"), at all times relevant to this Complaint, purposefully availed itself of the privilege of conducting employment activities within the state of Maryland. Markel Ventures is a corporation incorporated in the state of Virginia, and at all times material to this Complaint, operated Ellicott in Baltimore, Maryland. Markel maintains its headquarters at 4521 Highwoods Parkway, Glen Allen, VA 23060 and, at all times material to this Complaint, conducted and maintained operations in Baltimore, Maryland. Upon information and belief, there is a corporate relationship between Ellicott and Markel Ventures.

7.     At all times material to this Complaint, the Markel Defendants employed more than 500 employees and engaged in an "industry affecting commerce" within the meaning of 42 U.S.C. §§ 2000e-2(b) and (h).

8.     On or about March 23, 2020, Ms. Williams filed a Charge of Discrimination cross-filed with the EEOC and the Maryland Commission on Human Rights. On or about April 27, 2020, Ms. Williams filed an amended charge of discrimination and harassment based on her sex, race, and reprisal.

9.  Ms. Williams received a Notice of Right to Sue on February 25, 2021.

### VENUE

10.     Venue is proper in the United States Court for the District of Maryland pursuant to 28 U.S.C. § 1391(b)(1) because Ellicott's headquarters is located in Baltimore, Maryland.

11.     Venue is proper in the United States Court for the District of Maryland pursuant to 28 U.S.C. § 1391(b)(2) because the Markel Defendants conducted and maintained operations in Maryland.

12.     Pursuant to 28 U.S.C. § 1391(b)(2), all acts or omissions complained of occurred in Maryland.

## PARTIES

13.     Ms. Williams is a Black woman and a Maryland resident who, at all times material to this Complaint, was subjected to harassment on the basis of sex and race and discrimination on the basis of sex, race, and reprisal during her employment with Ellicott.

14.     At all times material to this Complaint, Ms. Williams was an "employee" within the meaning of Title VII, 42 U.S.C. § 2000e(f), MFEPA, State Gov't § 20-601(c)(1), and Baltimore County Code § 29-2-201.

15.     Ellicott is a corporation incorporated in the state of Maryland and, at all times material to this Complaint, conducted and maintained operations in Baltimore, Maryland. Ellicott maintains its headquarters at 1611 Bush Street, Baltimore, Maryland 21230.

16.     Ellicott is an "Employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b), MFEPA, State Gov't § 20-601(d)(1); and Baltimore County Code § 29-2-201.

17.     Upon information and belief, Ellicott controls the hiring and firing decisions; supervises and controls the work schedules or conditions of employment to a substantial degree; determines the employee's rate and method of payment; and maintains the employee's employment records.

18.     Markel Defendants are corporations incorporated in the state of Virginia, and at all times material to this Complaint, operated Ellicott in Baltimore, Maryland. Markel Defendants maintain their headquarters at 4521 Highwoods Parkway, Glen Allen, VA 23060.

19.     Markel Defendants are "Employers" within the meaning of Title VII, 42 U.S.C. § 2000e(b), MFEPA, State Gov't § 20-601(d)(1), and Baltimore County Code § 29-2-201.

20.     Upon information and belief, Ellicott is a wholly owned subsidiary of the Markel Defendants and the Markel Defendants control the conditions of employment to a substantial degree, determines the employee's rate and method of payment, and maintains the employee's employment records.

## FACTUAL BACKGROUND

20.     On or around August 9, 2018, Ms. Williams began her employment as a welder with Ellicott through a temporary staffing agency, Synerfac Staffing.

21.     In her position as a welder, Ms. Williams, performed shielded metal arc welding (SMAW) and gas metal arc welding (GMAW), read blueprints, took measurements, determined correct gas settings for welding components, and fit parts to be welded, among other duties.

22.     Ms. Williams initially began working under the supervision of Erik Dick, white male, Team Lead, in August 2018.  In or around October 2018, Mr. Dick informed Ms. Williams he was leaving Ellicott because he heard that Don Thomas, who had previously worked at the company, was returning to the company.

22.     Ms. Williams asked Ron White, a Black male forklift driver, about Don Thomas. Mr. White knew Don Thomas from his time at Ellicott previously, and stated that he believed bringing the Thomas brothers back was the wrong thing to do based on their reputations.

23.     Ms. Williams was one of two female welders at Ellicott during the relevant time

5

period. Karen [last name unknown] was also a Black woman who welded for Ellicott in another building at the same facility.

24.     Soon after Ms. Williams first began her employment, Ellicott hired an Asian female welder who had just graduated. This woman was fired after a few weeks. Before Ellicott fired her, she was subjected to many derogatory comments about her sexuality, and her male coworkers made jokes about how she appeared "butch" and looked like a man.

25.     Don Thomas returned to Ellicott in or around late September or early October 2018.  In October 2018, Mr. Thomas terminated Ms. Williams's employment during her probationary period. Upon information and belief, Mr. Thomas retained lesser qualified white males.

26.     Three weeks after Don Thomas terminated Ms. Williams, Mr. Strathy rehired her. When Mr. Strathy rehired Ms. Williams, he assured her the incident would not extend her probationary period. Contrary to this assurance, this incident extended Ms. Williams's 90-day probationary period by 33 days.

27.     In January 2019, Dale Thomas, Don Thomas's brother, returned to Ellicott after years away from the company and became Ms. Williams's supervisor. He immediately began treating her differently than the white welders and male welders.

28.     While Dale Thomas's title was "Team Lead," there was no other supervisor above him, and so he was effectively the fabrication shop supervisor for Ms. Williams and her colleagues.

29.     When seeking full time employment at Ellicott, each probationary welder was required to take and pass one weld test to be offered full-time employment.

30.     Ms. Williams took her weld test, passed, and was hired full time in December

2018.

31.     Beginning in May 2019, Dale Thomas singled out Ms. Williams and informed her that she would have to take a second weld test, even though she had already passed her weld test. He claimed it was necessary because he did not know her like he knew the other welders. Ms. Williams pointed out that Emmanuel Cephas was also a new employee, but Mr. Thomas did not require Mr. Cephas, a male welder, to take a second weld test.

32.     From May 2019 until February 2020, Dale Thomas required Ms. Williams to take approximately six welds tests, even though Ms. Williams passed each time. He continued to require her to take the same weld test each time. No male welders were required to take more than the weld test when they were hired.

33.     After requiring Ms. Williams to weld test, Mr. Thomas would cut open the weld to look at the inside, revealing a successful weld. He would then leave the test on his desk, say he cut the test incorrectly, and insist that Ms. Williams had to take another one.

34.     Dale Thomas falsely claimed that Ms. Williams did not pass several of the weld tests and used this as an excuse to force her to sweep and dust, rather than allowing her to do her job as a welder.

35.     Matt Pratt, the only certified weld test examiner at the time, evaluated some of the extra tests that Dale Thomas forced Ms. Williams to take, including those that Mr. Thomas said she had failed. After reviewing her wields, Mr. Pratt informed Ms. Williams that she did pass according the standards that he used as a certified weld test evaluator. Mr. Pratt even discussed the possibility of Ms. Williams becoming a welding tester for the company, giving her his personal books on inspecting welds and notes.

36.     Upon information and belief, Dale Thomas permitted male welders who had

failed a weld test to continue their employment and continue working on important welding projects.

37.     Upon information and belief, Dale Thomas did not require male welders to take more than one weld test during their employment. These tests Mr. Thomas administered to Ms. Williams appeared to be arbitrary since Ms. Williams passed her initial weld test to gain employment.

38.     In or around May 2019, Ms. Williams reported the humiliating incidents to Sandy Crawford in Human Resources. Ms. Williams told Ms. Crawford that she was the only welder being required to take more than one weld test and that she felt singled out by Mr. Thomas.

39.     While they were meeting, Ms. Crawford called Mr. Pratt, the certified weld test examiner, to ask if Ms. Williams had passed the customary weld test upon her hiring as a full-time employee. Mr. Pratt confirmed to Ms. Crawford that Ms. Williams had indeed passed the test. Ms. Crawford called Darrell Strathy, Superintendent, to her office to discuss the matter and dismissed Ms. Williams.

40.     When Ms. Williams returned to the workshop floor, Dale Thomas was inspecting one of Ms. Williams's welds with a flashlight, in the middle of the fabrication shop floor, in front of all the other welders, which he did not do for the male welders.

41.     Maurice Hart and Keyster [last name unknown], a black male welder who had worked for Ellicott for decades, told Dale Thomas that Ms. Williams had completed the weld in the way they had trained her to and that it was how they also performed the weld.

42.     Dale Thomas raised his voice at Ms. Williams and told her that she had completed the weld incorrectly. Ms. Williams told Mr. Thomas that if he continued to speak to her like that she would call her lawyer.

43.     Dale Thomas immediately went to Darrell Strathy. Mr. Strathy then called Ms. Williams into his office and said if you are going to be running to human resources you are going to need to find another job. Mr. Strathy then stated that he hoped Ms. Williams would not rile her coworkers up and start a mutiny.

44.     Ms. Williams's coworkers were aware that she was being treated differently because they witnessed Dale Thomas's actions.

45.     Other welders questioned why Dale Thomas would make such a spectacle of inspecting Ms. Williams's weld.  They commented that her weld looked correct and that it was welded how they were all trained to complete it.

46.     Keyster asked Dale Thomas why he was not requiring him to take a weld test again, despite requiring Ms. Williams to retest so many times.

47.     In or around December 2019, Dale Thomas required Ms. Williams to weld outside in the cold, despite every other welder working inside the heated building.

48.     Dale Thomas often claimed that Ellicott did not perform "stick welds" despite the fact that prior to Dale's arrival, Ms. Williams had performed stick welds in conjunction with another team lead.

49.     Dale Thomas prevented Ms. Williams from performing stick welds by saying Ellicott did not do that kind of work, but then would allow Daryl Farabee, Custodian, to practice stick welding in his spare time at work.

50.     In May 2019, Ms. Williams was also being sexually harassed by a white male in assembly, James Keener.

51.     Mr. Keener expressed interest in a romantic relationship with Ms. Williams. He said he had feelings for Ms. Williams and often made comments to her about how she was more

interesting and attractive than his wife.

52.     Ms. Williams rebuffed Mr. Keener, and he began to follow her around at work.

53.     Other coworkers came to Ms. Williams and told her to watch out because it appeared as if Mr. Keener was stalking her when he followed her around the workshop and stared at her when she was on ladders. Upon information and belief, several coworkers told Mr. Keener to leave Ms. Williams alone, and a few men also complained to Rob [last name unknown], a supervisor, about Mr. Keener's predatory behavior.

54.     Ms. Williams also reported Mr. Keener's conduct to her supervisor, Dale Thomas, informing him that she did not feel safe and was afraid of Mr. Keener.

55.     Dale Thomas said he would talk to Mr. Keener after the first incident, but Mr. Keener continued to make inappropriate comments about his relationship status and his interest in Ms. Williams. He also continued to follow Ms. Williams around the workplace, despite working in a different area of the building.

56.     Since Mr. Keener's behavior did not stop, Ms. Williams approached Dale Thomas about the issue again. In response, he told her that he never actually spoke to Mr. Keener and that, technically, Mr. Keener did not do anything wrong.

57.     Ms. Williams then reported Mr. Keener's threatening conduct to Mr. Strathy and told him she had already reported Mr. Keener's unwelcome conduct to Dale Thomas twice.

58.     Mr. Strathy responded to her complaint of sexual harassment by asking Ms. Williams what she wanted him to do. Ms. Williams told him that she just wanted Mr. Keener to leave her alone.

59.     Despite her complaints to her supervisor, Dale Thomas, and to the Superintendent, Mr. Strathy, Mr. Keener's harassment continued unabated.  To Ms. Williams's

knowledge, Ellicott did not take any meaningful steps to address her complaints, since the harassment continued.

60.     Ms. Williams was not the only Ellicott employee who had experienced problems with Mr. Keener's conduct. Antonio Eubanks, CNC Machinist, also complained to Mr. Strathy about Mr. Keener, who had started false rumors about Mr. Eubanks's sexuality. Upon information and belief, there was no action taken to address Mr. Keener's behavior. Mr. Eubanks informed Ms. Williams that Mr. Strathy made up excuses for his behavior and asked Mr. Eubanks not to go to Human Resource.

61.     Mr. Eubanks informed Ms. Williams he complained again to management regarding Mr. Keener targeting him a second time. Mr. Eubanks was allowed to meet with Mr. Keener, Mr. Strathy, and Mr. Keener's supervisor, Rob (last name unknown), to discuss his concerns.

62.     In that meeting, Mr. Eubanks stated that his ill treatment by Mr. Keener was a direct result of his friendship with Ms. Williams. Mr. Strathy told Mr. Keener that he needed to stop causing problems in the shop and that he hoped since they had previously discussed the incidents, Mr. Keener would stop instigating conflict with his coworkers.

63.     Mr. Marlon Taylor, welder, also subjected Ms. Williams to sex-based harassment, making repeated sexist comments about her, such as, "that's why your husband needs to beat your ass." He called her a variety of disparaging names, including a "dumb bitch" and a "cow," and told her she belonged in the kitchen.

64.     Ms. Williams reported Mr. Taylor's inappropriate comments to her supervisor, Dale Thomas, in or around October 2019, and informed him that Mr. Taylor was creating a hostile work environment for her.  As with the situation with Mr. Keener, Mr. Thomas said he

would talk to Mr. Taylor.

65.     Mr. Taylor's harassment of Ms. Williams continued unabated.

66.     After Ms. Williams complained to Dale Thomas about Mr. Taylor's conduct, Mr. Taylor began false rumors that Ms. Williams and Mr. Cephas were involved romantically, seemingly in retaliation for reporting his harassment.

67.     Ms. Williams again reported Mr. Taylor's conduct to Dale Thomas in or around November 2019.  Mr. Thomas told Ms. Williams that he would take the issue to Human Resources. Mr. Thomas also told Ms. Williams that Mr. Taylor needed to grow up and stop acting like a high schooler.

68.     However, Dale Thomas told Ms. Williams that, in response, Kate Bayer, Human Resources, asked him "what do you want me to do about it?"  When he conveyed this to Ms. Williams, Mr. Thomas's tone suggested that Ms. Bayer asked the question in a rhetorical and dismissive manner. Ms. Williams understood this to mean there would be no use in discussing her complaints with Ms. Bayer.

69.     After Ms. Bayer's refusal to respond in a meaningful way to her complaints, Ms. Williams emailed Dale Thomas and Albert Hewitt, Plant Superintendent, to complain about Mr. Taylor's harassment, but she did not receive any response.

70.     Beginning in or around October 2019, Dale Thomas began to prevent Ms. Williams from working overtime hours, which she had previously been able to do, such that she had to find additional part-time employment to make up for her suddenly reduced overtime hours.

71.     Ms. Williams asked Dale Thomas on multiple occasions to work overtime as she had in the past. In response, he told her that there was no work, that he was not coming in, or that

he was going camping, and therefore she could not come into work when he was not there.

72.     Dale Thomas allowed Ms. Williams's male colleagues to work overtime when he was not present, but he did not allow her to do the same.

73.     In or around December 2019, Ms. Williams again went to Dale Thomas and showed him the company had an anti-harassment policy on the bulletin board.

74.     Dale Thomas again said he would talk to Mr. Taylor, but there is no indication that anyone ever spoke to Mr. Taylor about his actions towards Ms. Williams, since he continued to harass her.

75.     In January 2020, Ms. Williams also again reported Mr. Taylor's continuing inappropriate comments about her status as a victim of abuse or calling her a dumb bitch and fat cow to Ms. Bayer, but to her knowledge, Ellicott took no action to address the harassment.

76.     In February 2020, Ms. Williams approached Ben Sumpter, Chief Executive Officer, to discuss Mr. Taylor's inappropriate comments and conduct, Mr. Keener's threatening and harassing behavior, and Dale Thomas's continued targeting of her.

77.     Mr. Sumpter told Ms. Williams he would not want his sister or mother to be treated that way, and he assured her he would make sure Ms. Williams was no longer treated that way. Despite Mr. Sumpter's assurances, the harassment and discrimination continued.

78.     Ms. Williams then met with Mr. Sumpter and Mr. Hewitt to discuss Dale Thomas's continued unwarranted scrutiny of her welding, despite having passed her welding test.  She showed Mr. Sumpter and Mr. Hewitt a picture of her weld, and they agreed it was an excellent weld.

79.     Dale Thomas said he disagreed, and he had another welder grind out the weld, erasing Ms. Williams's work and requiring it to be re-welded. Ms. William also showed Mr.

Hewitt and Mr. Sumpter pictures of a coworker's weld that Mr. Thomas did not find

unacceptable but was much worse than Ms. Williams's weld.

80.     Mr. Sumpter assured Ms. Williams there would be an investigation into the

harassment by Dale Thomas.

81.     In February 2020, Ellicott sent a survey to the employees, which contained

general questions about how the employees felt about their supervisor, Dale Thomas, but to Ms.

Williams's knowledge, took no other action.

82.     Dale Thomas increased his scrutiny and targeting of Ms. Williams after the

survey was sent to employees. On a daily basis, he critiqued Ms. Williams's welding work,

despite her work often being superior to that of her male colleagues and required her to perform

inventory duties instead of welding.

83.     In one instance, Dale Thomas walked Ms. Williams over to the paint shop to

show her all the pin holes and imperfections in her weld that he wanted her to re-weld. However,

Ms. Williams pointed out that it was not her work because she could recognize by the welding

technique used it was the work of a male colleague. Mr. Thomas did not require that male welder

to re-weld the mistakes he showed Ms. Williams. Instead Mr. Thomas dropped the issue when

Ms. Williams informed him it was not her work.

84.     Throughout Ms. Williams's time at Ellicott, Ellicott did not have a designated

women's restroom in the building for her to use. As such, Ellicott designated a handicap

restroom on the ground floor for her use, but men continued to use that restroom despite having a

designated men's room upstairs.

85.     Karen [last name unknown], the only other female welder at Ellicott, worked in

the other building at the facility and informed Ms. Williams she also complained to Human

Resources that the men were using her designated women's restroom and leaving urine and feces over the toilet.

86.     In addition, two male welders had lockers in the restroom designated for Ms. Williams's use. Male employees would soil her restroom by leaving feces on the toilet and floor and urinating on the toilet seat. She would have to clean their defecation from her designated toilet in order to use it. Ms. Williams showed Mr. Hewitt the feces in February 2020, and he instructed Darryl Farabee, Custodian, to change the locks on the bathroom door. Men continued to soil the restroom even after the lock was changed.

87.     In addition to men continuing to use the bathroom, there was also a hole in the ceiling of Ms. Williams's designated restroom, and some of her colleagues told Ms. Williams that men were able to look through the hole at her from their restroom upstairs.

88.     On or around March 30, 2020, Ellicott terminated Ms. Williams. Upon information and belief, Ellicott terminated Karen [last name unknown] on the same day. Upon information and belief, they were the only black women who worked as welders. Upon information and belief, they both engaged in protected activity prior to their termination.

89.     Upon information and belief, similarly-situated white employees were not terminated at the same time as Ms. Williams, although some white employees were terminated weeks later.

90.     Based upon information and belief, similarly-situated male employees were not terminated at the same time as Ms. Williams, although some male employees were terminated weeks later.

### Count I – Harassment Based on Sex in Violation of Baltimore County Code § 29-2-201 et. seq.

93.     Ms. Williams re-alleges and incorporates the allegations set forth in the preceding

paragraphs as though each and every allegation is fully set forth herein.

94.     At all times material to this Complaint, Ms. Williams was a member of the class of persons protected by Baltimore County Code based on her sex. Baltimore County Code § 29-1-101(d).

95.     Defendants are employers within the meaning of Baltimore County Code § 29-2-201(c).

96.     As described in the proceeding paragraphs, Defendants subjected Ms. Williams to a hostile work environment in the form of offensive comments, degrading work assignments, stalking, and unwanted sexual advances.

97.     Dale Thomas forced Ms. Williams to take repeated weld tests that none of her male colleagues were required to take and he scrutinized her work while allowing poor workmanship by men.

98.     Mr. Keener harassed her when he pursued her romantically and did not stop despite her attempts to rebuff him or when she reported him to management.

99.     Mr. Taylor harassed her when called her a dumb bitch and fat cow and made other disparaging comments about her.

100.     Complainant's male coworkers subjected her to unwelcome conduct when they defecated in her restroom, left it soiled, and said they could watch her in the restroom through a hole in the wall.

101.     The harassing conduct was based on Ms. Williams's sex and was unwelcome.

102.     The actions taken toward Ms. Williams were sufficiently severe or pervasive so as to create an intimidating, hostile, and offensive work environment.

103.     Defendants were aware of the harassment because Mr. Thomas was Ms.

William's supervisor and because Ms. Williams reported and expressed opposition to the

harassment directly to her harassers, as well as to Mr. Strathy, superintendent, Ms. Crawford,

Human Resources, Ms. Bayer, Human Resources, Mr. Albert Hewitt, and Mr. Sumpter, CEO.

104.     Defendants failed to prevent and correct the harassment or take prompt remedial

action regarding the harassment.

105.     The harassment culminated in Ms. Williams's termination.

106.     As a result of Defendants' actions, Ms. Williams suffered significant

compensatory and consequential damages including lost wages, out of pocket costs, mental

anguish, depression, stress, humiliation, embarrassment, physical ailments, damage to her

professional reputation, loss of enjoyment of life, and attorney's fees and costs.

107.     Defendants' actions were wanton, reckless, or in willful disregard of Plaintiff's

legal rights.

**Count II –Harassment on the Basis of Race In Violation of
Baltimore County Code § 29-2-201 et. seq.**

108.      Ms. Williams re-alleges and incorporates the allegations set forth in the

preceding paragraphs as though each and every allegation is fully set forth herein.

109.     At all times material to this Complaint, Ms. Williams was a was a member of the

class of persons protected by Baltimore County Code based on her race.  Baltimore County Code

§ 29-1-101(d).

110.     Defendants are employers within the meaning of Baltimore County Code § 29-2-

201(c).

111.     As described in the proceeding paragraphs, Defendants subjected Ms. Williams to

a hostile work environment when they subjected her to, *inter alia*, offensive comments,

degrading work assignments, and heightened scrutiny of her work product that was not applied

to her white co-workers.

112.   Don and Dale Thomas's conduct was based on Ms. Williams's race. They subjected Ms. Williams to intense scrutiny and targeted her, even firing her during her probationary period, while treating white welders differently.

113.   Defendants' conduct was unwelcome.

114.   Defendants' actions toward Ms. Williams were sufficiently severe or pervasive so as to create an intimidating, hostile, and offensive work environment.

115.   Ms. Williams reported and expressed opposition to the harassment to Mr. Thomas, Mr. Taylor, and Mr. Keener, as well as to Mr. Strathy, Superintendent, Ms. Crawford, Human Resources, Ms. Bayer, Human Resources, Mr. Hewitt, and Mr. Sumpter, CEO.

116.   Defendants were aware of the harassment and were aware that the conduct was unwelcome, as Ms. Williams had complained multiple times.

117.   Defendants failed to prevent and correct the harassment or take prompt remedial action regarding the harassment.

118.   The harassment culminated in Ms. Williams's termination.

119.   As a result of Defendants' actions, Ms. Williams suffered significant compensatory and consequential damages, including lost wages, out of pocket costs, mental anguish, depression, stress, humiliation, embarrassment, physical ailments, damage to her professional reputation, loss of enjoyment of life, and attorney's fees and costs.

120.   Defendants' actions were wanton, reckless, or in willful disregard of Plaintiff's legal rights.

### Count III – Discrimination on the Basis of Sex In Violation of Baltimore County Code § 29-2-201 et. seq.

121.   Ms. Williams re-alleges and incorporates the allegations set forth in the

preceding paragraphs as though each and every allegation is fully set forth herein.

122.     At all times material to this Complaint, Ms. Williams was a member of the class of persons protected by Baltimore County Code based on her sex. Baltimore County Code § 29-1-101(d).

123.     Defendants are employers within the meaning of Baltimore County Code § 29-2-201(c).

124.     Defendants engaged in an unlawful employment action when it terminated Ms. Williams's employment in March 2020 based on her sex.

125.     Based upon information and belief, similarly-situated male employees were not terminated at the same time as Ms. Williams, although some male employees were terminated weeks later.

126.     As a result of Defendants' actions, Ms. Williams suffered significant compensatory and consequential damages including lost wages, out of pocket costs, mental anguish, depression, stress, humiliation, embarrassment, physical ailments, damage to her professional reputation, loss of enjoyment of life, and attorney's fees and costs.

127.     Defendants' actions were wanton, reckless, or in willful disregard of Plaintiff's legal rights.

**Count IV - Discrimination on the Basis of Race**
**In Violation of In Violation of Baltimore County Code § 29-2-202**

128.     Ms. Williams re-alleges and incorporates the allegations set forth in the preceding paragraphs as though each and every allegation is fully set forth herein.

129.     At all times material to this Complaint, Ms. Williams was a member of the class of persons protected by Baltimore County Code based on her race. Baltimore County Code § 29-1-101(d).

130.    Defendants are employers within the meaning of Baltimore County Code § 29-2-201(c).

131.    Defendants engaged in an unlawful employment action when it terminated Ms. Williams's employment in March 2020 based on Ms. Williams's race.

132.    Based upon information and belief, similarly-situated white employees were not terminated at the same time as Ms. Williams, although some white employees were terminated weeks later.

133.    As a result of Defendants' actions, Ms. Williams suffered significant compensatory and consequential damages in the form of lost wages, out of pocket costs, mental anguish, depression, stress, humiliation, embarrassment, physical ailments, damage to her professional reputation, loss of enjoyment of life, and attorney's fees and costs.

134.    Defendants' actions were wanton, reckless, or in willful disregard of Plaintiff's legal rights.

**Count V –Retaliation in Violation of**
**Baltimore County Code § 29-2-201 et. seq.**

135.     Ms. Williams re-alleges and incorporates the allegations set forth in the preceding paragraphs as though each and every allegation is fully set forth herein.

136.    As described in the proceeding paragraphs, Defendants subjected Ms. Williams to a hostile work environment in the form of offensive comments, degrading work assignments, and stalking.

137.    Ms. Williams engaged in protected activity when she reported and expressed opposition to the harassment to Mr. Thomas, Mr. Taylor, and Mr. Keener, as well as to Mr. Strathy, superintendent, Ms. Crawford, Human Resources, Ms. Bayer, Human Resources, Mr. Hewitt, and Mr. Sumpter, CEO.

138. Defendants retaliated against Ms. Williams when Mr. Strathy attempted to deter her from engaging in protected activity by telling her she needed to stop complaining to HR or look for a new job when she sought assistance in remediating the harassment.

139. Ms. Williams was treated less favorably than other similarly situated employees who did not engage in protected activity.

140. Defendants further retaliated against Ms. Williams when, in March 2020, it terminated her employment earlier than it terminated the employment of employees who did not engage in protected activity.

141. As a result of Defendants' actions, Ms. Williams suffered significant compensatory and consequential damages including lost wages, out of pocket costs, mental anguish, depression, stress, humiliation, embarrassment, physical ailments, damage to her professional reputation, loss of enjoyment of life, and attorney's fees and costs.

142. Defendants' actions were wanton, reckless, or in willful disregard of Plaintiff's legal rights.

**Count VI- Harassment Based on Sex in Violation of Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-601 et seq.**

143. Ms. Williams re-alleges and incorporates the allegations set forth in the preceding paragraphs as though each and every allegation is fully set forth herein.

144. At all times material to this Complaint, Ms. Williams was a member of a protected group within the meaning of MFEPA, as she is a woman. Md. Code Ann., State Gov't § 20-606(a)(1).

145. At all times material to this Complaint, Defendants were employers within the meaning of the MFEPA. *Id.* § 20-601(d).

146. Defendants were aware that Ms. Williams was a member of a protected class.

21

147.    As described in the proceeding paragraphs, Defendants subjected Ms. Williams to a hostile work environment in the form of offensive comments, degrading work assignments, stalking, and unwanted sexual advances.

148.    Dale Thomas harassed her when he forced her to take unnecessary weld tests, publicly and inaccurately criticized her work, and ordered her to perform tasks such as sweeping and inventory.

149.    Mr. Keener harassed her when he pursued her romantically and did not stop despite her attempts to rebuff him or when she reported him to management.

150.    Mr. Taylor harassed her when called her a dumb bitch, a fat cow and made other disparaging comments about her.

151.    In general, she was treated poorly by all her coworkers as a woman when they defecated in her restroom, left it soiled, and said they could watch her in the restroom through a hole in the wall.

152.    The harassing conduct was based on Ms. Williams's sex and was unwelcome.

153.    Defendants' actions taken toward Ms. Williams were sufficiently severe or pervasive so as to create an intimidating, hostile, and offensive work environment.

154.    Ms. Williams reported and expressed opposition to the harassment to Mr. Thomas, Mr. Taylor, and Mr. Keener, as well as to Mr. Strathy, Superintendent, Ms. Sandy Crawford, Human Resources, Ms. Bayer, Human Resources, Mr. Hewitt, and Mr. Sumpter, CEO.

155.    Defendants were aware of the harassment and were aware that the conduct was unwelcome, as Ms. Williams had complained multiple times.

156.    Defendants failed to prevent and correct the harassment or take prompt remedial

action regarding the harassment.

157.     The harassment culminated in Ms. Williams's termination.

158.     As a result of Defendants' actions, Ms. Williams suffered significant compensatory and consequential damages, including lost wages, out of pocket costs, mental anguish, depression, stress, humiliation, embarrassment, physical ailments, damage to her professional reputation, loss of enjoyment of life, and attorney's fees and costs.

159.     Defendants' actions were wanton, reckless, or in willful disregard of Ms. Williams's legal rights.

**Count VII - Harassment Based on Race in Violation of Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-601 et seq.**

160.     Ms. Williams re-alleges and incorporates the allegations set forth in the preceding paragraphs as though each and every allegation is fully set forth herein.

161.     At all times material to this Complaint, Ms. Williams was a member of a protected group within the meaning of MFEPA, as she is Black. Md. Code Ann., State Gov't § 20-606(a)(1).

162.     At all times material to this Complaint, Defendants were employers within the meaning of the MFEPA.  *Id.* § 20-601(d).

163.     Defendants were aware that Ms. Williams was a member of a protected class based on her race.

164.     As described in the proceeding paragraphs, Defendants subjected Ms. Williams to a hostile work environment when they subjected her to, *inter alia*, offensive comments, degrading work assignments, and heightened scrutiny of her work product that was not applied to her white co-workers.

165.     Don and Dale Thomas's conduct was based on Ms. Williams's race. They

subjected Ms. Williams to intense scrutiny and targeted her, even firing her during her probationary period, while treating white welders differently.

166.    Defendants' conduct was unwelcome.

167.    Defendants' actions toward Ms. Williams were sufficiently severe or pervasive so as to create an intimidating, hostile, and offensive work environment.

168.    Ms. Williams reported and expressed opposition to the harassment to Mr. Thomas, Mr. Taylor, and Mr. Keener, as well as to Mr. Strathy, Superintendent, Ms. Crawford, Human Resources, Ms. Bayer, Human Resources, Mr. Hewitt, and Mr. Sumpter, CEO.

169.    Defendants were aware of the harassment and were aware that the conduct was unwelcome, as Ms. Williams had complained multiple times.

170.    Defendants failed to prevent and correct the harassment or take prompt remedial action regarding the harassment.

171.    The harassment culminated in Ms. Williams's termination.

172.    As a result of Defendants' actions, Ms. Williams suffered significant compensatory and consequential damages, including lost wages, out of pocket costs, mental anguish, depression, stress, humiliation, embarrassment, physical ailments, damage to her professional reputation, loss of enjoyment of life, and attorney's fees and costs.

173.    Defendants' actions were wanton, reckless, or in willful disregard of Plaintiff's legal rights.

### Count VIII – Discrimination on the Basis of Sex in Violation of the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-601 *et seq.*

174.    Ms. Williams re-alleges and incorporates the allegations set forth in the preceding paragraphs as though each and every allegation is fully set forth herein.

175.    At all times material to this complaint, Ms. Williams was a member of a protected group within the meaning of the MFEPA, as she is a woman. Md. Code Ann., State Gov't § 20-606(a)(1).

176.    At all times material to this Complaint, Defendants employers within the meaning of the MFEPA. *Id.* § 20-601(d).

177.    Defendants engaged in an unlawful employment action when, in March 2020, it terminated Ms. Williams's employment based on her sex.

178.    Based upon information and belief, similarly-situated male employees were not terminated at the same time as Ms. Williams, although some male employees were terminated weeks later.

179.    As a result of Defendants' actions, Ms. Williams suffered significant compensatory and consequential damages including lost wages, out of pocket costs, mental anguish, depression, stress, humiliation, embarrassment, physical ailments, damage to her professional reputation, loss of enjoyment of life, and attorney's fees and costs.

180.    Defendants' actions were wanton, reckless, or in willful disregard of Plaintiff's legal rights.

### Count IX - Discrimination on the Basis of Race
### In Violation of the Maryland Fair Employment Practices Act,
### Md. Code Ann., State Gov't § 20-601 et seq.

181.    Ms. Williams re-alleges and incorporates the allegations set forth in the preceding paragraphs as though each and every allegation is fully set forth herein.

182.    At all times material to this Complaint, Ms. Williams was a member of a protected group within the meaning of MFEPA, as she is Black. Md. Code Ann., State Gov't § 20-606(a)(1).

183. At all times material to this Complaint, Defendants were an employer for the purposes of MFEPA. *Id.* § 20-601(d).

184. Defendants engaged in an unlawful employment action when, in March 2020, it terminated Ms. Williams's employment based on Ms. Williams's race.

185. Based upon information and belief, similarly-situated white employees were not terminated at the same time as Ms. Williams, although some white employees were terminated weeks later.

186. As a result of Defendants' actions, Ms. Williams suffered significant compensatory and consequential damages in the form of lost wages, out of pocket costs, mental anguish, depression, stress, humiliation, embarrassment, physical ailments, damage to her professional reputation, loss of enjoyment of life, and attorney's fees and costs.

187. Defendants' actions were wanton, reckless, or in willful disregard of Plaintiff's legal rights.

### Count X- Retaliation in Violation of Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-601 et seq.

188. Ms. Williams re-alleges and incorporates the allegations set forth in the preceding paragraphs as though each and every allegation is fully set forth herein.

189. As described in the proceeding paragraphs, Defendants subjected Ms. Williams to a hostile work environment in the form of offensive comments, degrading work assignments, and stalking.

190. Ms. Williams engaged in protected activity when she reported and expressed opposition to the harassment to Mr. Thomas, Mr. Taylor, and Mr. Keener, as well as to Mr. Strathy, superintendent, Ms. Crawford, Human Resources, Ms. Bayer, Human Resources, Mr. Hewitt, and Mr. Sumpter, CEO.

191.    Defendants retaliated against Ms. Williams when Mr. Strathy attempted to deter her from engaging in protected activity by telling her she needed to stop complaining to HR or look for a new job when she sought assistance in remediating the harassment.

192.    Defendants treated Ms. Williams less favorably than other similarly situated employees who did not engage in protected activity.

193.    Defendants further retaliated against Ms. Williams when in, March 2020, it terminated her employment earlier than it terminated the employment of employees who did not engage in protected activity.

194.    As a result of Defendants' actions, Ms. Williams suffered significant compensatory and consequential damages including lost wages, out of pocket costs, mental anguish, depression, stress, humiliation, embarrassment, physical ailments, damage to her professional reputation, loss of enjoyment of life, and attorney's fees and costs.

195.    Defendants' actions were wanton, reckless, or in willful disregard of Plaintiff's legal rights.

**Count XI - Harassment Based on Sex in Violation of Title VII of
The Civil Rights Act, 42 U.S.C. § 2000e-2(a).**

196.     Ms. Williams re-alleges and incorporates the allegations set forth in the preceding paragraphs as though each and every allegation is fully set forth herein.

197.    At all times material to this Complaint, Ms. Williams was a member of the class of persons protected by federal statutes based on her sex. 42 U.S.C. § 2000e-2(a).

198.    Defendants are employers within the meaning of Title VII, as amended, 42 U.S.C. § 2000e-2(a).

199.    Defendants were aware that Ms. Williams was a member of a protected class.

200.    As described in the proceeding paragraphs, Defendants subjected Ms. Williams to

a hostile work environment in the form of offensive comments, degrading work assignments, stalking, and unwanted sexual advances.

201.    Dale Thomas harassed her when he forced her to take unnecessary weld tests, publicly and inaccurately criticized her work, and ordered her to perform tasks such as sweeping and inventory.

202.    Mr. Keener harassed her when he pursued her romantically and did not stop despite to her attempts to rebuff him or when she reported him to management.

203.    Mr. Taylor harassed her when called her a dumb bitch and a fat cow and made other disparaging comments about her.

204.    Ms. Williams's male coworkers subjected her to unwelcome conduct when they defecated in her restroom, left it soiled, and said they could watch her in the restroom through a hole in the wall.

205.    The harassing conduct was based on Ms. Williams's sex and was unwelcome.

206.    The actions taken toward Ms. Williams were sufficiently severe or pervasive so as to create an intimidating, hostile, and offensive work environment.

207.    Defendants were aware of the harassment because Mr. Thomas was Ms. William's supervisor and because Ms. Williams reported and expressed opposition to the harassment directly to her harassers, as well as to Mr. Strathy, superintendent, Ms. Crawford, Human Resources, Ms. Bayer, Human Resources, Mr. Albert Hewitt, and Mr. Sumpter, CEO.

208.    Defendants failed to prevent and correct the harassment or take prompt remedial action regarding the harassment.

209.    The harassment culminated in Ms. Williams's termination.

210.    As a result of Defendants' actions, Ms. Williams suffered significant

28

compensatory and consequential damages including lost wages, out of pocket costs, mental anguish, depression, stress, humiliation, embarrassment, physical ailments, damage to her professional reputation, loss of enjoyment of life, and attorney's fees and costs.

211.    Defendants' actions were wanton, reckless, or in willful disregard of Plaintiff's legal rights.

### Count XII - Harassment Based on Race in Violation of Title VII of The Civil Rights Act, 42 U.S.C. § 2000e-2(a).

212.     Ms. Williams re-alleges and incorporates the allegations set forth in the preceding paragraphs as though each and every allegation is fully set forth herein.

213.    At all times material to this Complaint, Ms. Williams was a member of the class of persons protected by federal statutes based on her race. 42 U.S.C. § 2000e-2(a).

214.    Defendants are employers within the meaning of Title VII, as amended, 42 U.S.C. § 2000e-2(a).

215.    Defendants were aware that Ms. Williams was a member of a protected class based on her race.

216.    As described in the proceeding paragraphs, Defendants subjected Ms. Williams to a hostile work environment when they subjected her to, *inter alia*, offensive comments, degrading work assignments, and heightened scrutiny of her work product that was not applied to her white co-workers.

217.    Don and Dale Thomas's conduct was based on Ms. Williams's race. They subjected Ms. Williams to intense scrutiny and targeted her, even firing her during her probationary period, while treating white welders differently.

218.    Defendants' conduct was unwelcome.

219.    Defendants' actions toward Ms. Williams were sufficiently severe or pervasive so

as to create an intimidating, hostile, and offensive work environment.

220.    Ms. Williams reported and expressed opposition to the harassment to Mr. Thomas, Mr. Taylor, and Mr. Keener, as well as to Mr. Strathy, Superintendent, Ms. Crawford, Human Resources, Ms. Bayer, Human Resources, Mr. Hewitt, and Mr. Sumpter, CEO.

221.    Defendants were aware of the harassment and were aware that the conduct was unwelcome, as Ms. Williams had complained multiple times.

222.    Defendants failed to prevent and correct the harassment or take prompt remedial action regarding the harassment.

223.    The harassment culminated in Ms. Williams's termination.

224.    As a result of Defendants' actions, Ms. Williams suffered significant compensatory and consequential damages, including lost wages, out of pocket costs, mental anguish, depression, stress, humiliation, embarrassment, physical ailments, damage to her professional reputation, loss of enjoyment of life, and attorney's fees and costs.

225.    Defendants' actions were wanton, reckless, or in willful disregard of Plaintiff's legal rights.

## Count XIII - Discrimination Based on Sex in Violation of Title VII of The Civil Rights Act, 42 U.S.C. § 2000e-2(a).

226.    Ms. Williams re-alleges and incorporates the allegations set forth in the preceding paragraphs as though each and every allegation is fully set forth herein.

227.    At all times material to this Complaint, Ms. Williams was a member of the class of persons protected by federal statutes based on her sex. 42 U.S.C. § 2000e-2(a).

228.    Defendants are employers within the meaning of Title VII, as amended, 42 U.S.C. § 2000e-2(a).

229.    Defendants engaged in an unlawful employment action when, in March 2020, it terminated Ms. Williams's employment based on her sex.

230.    Based upon information and belief, similarly-situated male employees were not terminated at the same time as Ms. Williams, although some male employees were terminated weeks later.

231.    As a result of Defendants' actions, Ms. Williams suffered significant compensatory and consequential damages including lost wages, out of pocket costs, mental anguish, depression, stress, humiliation, embarrassment, physical ailments, damage to her professional reputation, loss of enjoyment of life, and attorney's fees and costs.

232.    Defendants' actions were wanton, reckless, or in willful disregard of Plaintiff's legal rights.

### Count XIV - Discrimination Based on Race in Violation of Title VII of The Civil Rights Act, 42 U.S.C. § 2000e-2(a).

233.    Ms. Williams re-alleges and incorporates the allegations set forth in the preceding paragraphs as though each and every allegation is fully set forth herein.

234.    At all times material to this Complaint, Ms. Williams was a member of the class of persons protected by federal statutes based on her race. 42 U.S.C. § 2000e-2(a).

235.    Defendants are employers within the meaning of Title VII, as amended, 42 U.S.C. § 2000e-2(a).

236.    Defendants engaged in an unlawful employment action when, in March 2020, it terminated Ms. Williams's employment based on Ms. Williams's race.

237.    Based upon information and belief, similarly-situated white employees were not terminated at the same time as Ms. Williams, although some white employees were terminated weeks later.

238.    As a result of Defendants' actions, Ms. Williams suffered significant compensatory and consequential damages in the form of lost wages, out of pocket costs, mental anguish, depression, stress, humiliation, embarrassment, physical ailments, damage to her professional reputation, loss of enjoyment of life, and attorney's fees and costs.

239.    Defendants' actions were wanton, reckless, or in willful disregard of Plaintiff's legal rights.

**Count XV – Retaliation in Violation of Title VII of the Civil Rights Act,**
**42 U.S.C. §2000e et seq.**

240.    Ms. Williams re-alleges and incorporates the allegations set forth in the preceding paragraphs as though each and every allegation is fully set forth herein.

241.    As described in the proceeding paragraphs, Defendants subjected Ms. Williams to a hostile work environment in the form of offensive comments, degrading work assignments, and stalking.

242.    Ms. Williams engaged in protected activity when she reported and expressed opposition to Defendants' harassment to Mr. Thomas, Mr. Taylor, and Mr. Keener, as well as to Mr. Strathy, superintendent, Ms. Crawford, Human Resource, Ms. Bayer, Human Resources; Mr. Hewitt, and Mr. Sumpter, CEO.

243.    Defendants retaliated against Ms. Williams when Mr. Strathy told her she needed to stop complaining about harassment to HR or look for a new job.

244.    Ms. Williams was treated less favorably than other similarly situated employees who did not engage in protected activity.

245.    Defendants also retaliated against Ms. Williams when, in March 2020, they terminated her employment earlier than it terminated the employment of employees who did not engage in protected activity.

246.   As a result of Defendants' actions, Ms. Williams suffered significant compensatory and consequential damages including lost wages, out of pocket costs, mental anguish, depression, stress, humiliation, embarrassment, physical ailments, damage to her professional reputation, loss of enjoyment of life, and attorney's fees and costs.

247.   Defendants' actions were wanton, reckless, or in willful disregard of Plaintiff's legal rights.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Williams respectfully prays that his Court grant her the following:

A.   Declare that Defendants' acts and practices violate county, state, and federal laws prohibiting discrimination on the bases of sex, race, and retaliation;

B.   Order Defendants to pay Ms. Williams back pay and benefits, with interest;

C.   Order Defendants to reinstate Ms. Williams; or, in the alternative order front pay;

D.   Order Defendants to implement both anti-discrimination measures to ensure that Defendants' unlawful employment practices are identified and eliminated and anti-discrimination training for Defendants employees and agents, and to provide all other equitable relief to which Ms. Williams is entitled;

E.   Award Ms. Williams compensatory damages for the economic and emotional harms she experienced as a result of Defendants' actions;

F.   Award Ms. Williams punitive damages in an amount to be determined by a jury;

G.   Award all pre-judgment interest allowed by law;

H.   Award Ms. Williams reasonable attorneys' fees and costs as authorized by Title VII and MFEPA; and

I.      Order Defendant and its officials, agents, employees, and successors to not discriminate on the basis of race or sex and to further order such proactive actions on the part of the employer to ensure such conduct does not occur in the future and to further order injunctive relief that defendant not retaliate against or engage in conduct that adversely affects any person because that person has reported acts of discrimination, harassment, or retaliation;

J.      Award any other such relief this Court deems just and proper.

### **JURY DEMAND**

Plaintiff demands a trial by jury on all issues.


Dated: May 24, 2020                               Respectfully submitted,

                                                  */s/Shannon C. Leary*
                                                  Shannon C. Leary, Esq., Bar No. 18396
                                                  Gary M. Gilbert, Esq., Bar No. 15808
                                                  *Attorneys for Plaintiff*
                                                  Gilbert Employment Law, P.C.
                                                  1100 Wayne Ave, Suite 900
                                                  Silver Spring, MD 20910
                                                  Tel: (301) 608-0880; Fax: (301) 608-0881
                                                  Sleary-efile@gelawyer.com
                                                  Gary-efile@gelawyer.com