IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KENSIL WILLIAMS, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. GLR-21-1282 |
| ELLICOTT DREDGES, LLC, | * | |
| Defendant. | * | |

***

# MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant Ellicott Dredges, LLC's ("Ellicott") Partial Motion to Dismiss Plaintiff's Complaint (ECF No. 6). The Motion is ripe for disposition and no hearing is necessary. See Local Rule 105.6 (D.Md. 2021). For the reasons outlined below, the Court will grant the Motion in part and deny the Motion in part.

## I. BACKGROUND

### A. Factual Background[1]

Plaintiff Kensil Williams worked for Ellicott as a welder between August 9, 2018 and March 30, 2020. (Compl. ¶¶ 20, 88, ECF No. 1). Williams was one of two female welders at Ellicott during the overwhelming majority of this period. (Id. ¶ 23). The exception was an Asian woman who was hired and fired shortly after Williams' employment began. (Id. ¶ 24). During her brief employment, the Asian woman's male

---

[1] Unless otherwise noted, the Court takes the following facts from the Complaint (ECF No. 1) and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

coworkers subjected her to "many derogatory comments about her sexuality" and "made jokes about how she appeared 'butch' and looked like a man." (Id.).

Williams initially worked under the supervision of Erik Dick, Team Lead. (Id. ¶ 22a).[2] In late September or early October 2018, Don Thomas ("Don") replaced Dick as Williams' supervisor. (Id. ¶¶ 22a, 25). Don promptly terminated Williams in October 2018 while retaining unnamed lesser qualified white males. (Id. ¶ 25). Three weeks later, Darrell Strathy, Superintendent, rehired Williams. (Id. ¶ 26). Williams took her weld test, passed, and was hired full time as a welder in December 2018. (Id. ¶ 30). In January 2019, Dale Thomas ("Dale"), Don's brother, replaced Don as Williams' supervisor. (Id. ¶ 27).

Beginning in May 2019 and continuing through February 2020, Dale required Williams to take approximately six additional weld tests. (Id. ¶¶ 31–32). Each test was the same. (Id. ¶ 32). Dale falsely claimed that Williams did not pass "the weld tests and used this as an excuse to force her to sweep and dust, rather than allowing her to do her job as a welder." (Id. ¶ 34). Dale asserted that the tests were "necessary because he did not know her like he knew the other welders." (Id. ¶ 31). In reality, Williams passed her first weld test and each subsequent one. (Id. ¶¶ 31–32). Matt Pratt, Ellicott's only certified weld test examiner at the time, evaluated some of Williams' tests, including those that Dale said she had failed. (Id. ¶ 35). Pratt informed Williams that according to the standards he used as a certified weld test evaluator, she passed the tests he evaluated. (Id.). Dale did not require Emmanuel Cephas, a new male employee, to take any additional tests. (Id. ¶ 31). In fact,

---

[2] The Complaint includes two paragraphs labeled as Paragraph 22. The Court will refer to the first Paragraph 22 as ¶ 22a and the second Paragraph 22 as ¶ 22b.

Dale generally did not require male welders to take more than one weld test and allowed male welders who failed their weld test to continue working on welding projects. (Id. ¶¶ 36–37). Indeed, another welder eventually asked Dale "why he was not requiring him to take a weld test again, despite requiring Ms. Williams to retest so many times." (Id. ¶ 46).

In May 2019, Williams reported the mistreatment to Sandy Crawford in Human Resources. (Id. ¶ 38). Crawford called in Pratt, who confirmed that Williams had passed her initial weld test. (Id. ¶ 39). Crawford then called in Strathy and dismissed Williams from her office. (Id.). When Williams returned to the workshop floor, Dale was inspecting one of her welds with a flashlight in front of her coworkers. (Id. ¶ 40). Two other welders told Dale that Williams had performed the weld correctly, but Dale raised his voice and insisted she had done it incorrectly. (Id. ¶¶ 41–42). Dale then spoke to Strathy. (Id. ¶ 43). Afterwards, Strathy called Williams into his office and told her that if she was "going to be running to human resources [she was] going to need to find another job." (Id.).

Also in May 2019, Williams was being sexually harassed by a white male Ellicott employee named James Keener. (Id. ¶ 50). Keener told Williams that he was interested in a romantic relationship with her and commented that "she was more interesting and attractive than his wife." (Id. ¶ 51). When Williams rebuffed Keener, "he began to follow her around at work." (Id. ¶ 52). The harassment was sufficiently conspicuous that several coworkers told Keener to leave Williams alone and even complained to a supervisor about Keener's behavior. (Id. ¶ 53). Williams also reported Keener's conduct to Dale. (Id. ¶ 54). While Dale asserted that he would speak to Keener, Keener continued to make

inappropriate comments to Williams and follow her around. (Id. ¶ 55). When Williams again reported the conduct to Dale, Dale replied that he had not spoken to Keener and that, in his view, Keener had "technically" done nothing wrong. (Id. ¶ 56). Williams thus escalated her report to Strathy. (Id. ¶ 57). When Strathy asked Williams what she wanted him to do, she told him that she simply wanted Keener to leave her alone. (Id. ¶ 58).

Keener also began harassing one of Williams' friends at Ellicott, Antonio Eubanks, by starting false rumors about Eubanks' sexuality. (Id. ¶ 60). Eubanks reported this behavior to Strathy, who made excuses for Keener and asked Eubanks not to go to Human Resources. (Id. ¶ 60). Despite these reports, Keener's harassment continued. (Id. ¶ 59). Williams is unaware of any steps Ellicott took to stop the harassment. (Id.).

Marlon Taylor, another welder, also harassed Williams at work by subjecting her to repeated sexist comments. (Id. ¶ 63). Taylor called her a variety of disparaging names, including a "dumb bitch" and a "cow," told her she belonged in the kitchen, and told her "that's why your husband needs to beat your ass." (Id.). Williams reported this harassment to Dale in October 2019. (Id. ¶ 64). Although Dale once again stated he would talk to the harasser, the harassment continued. (Id. ¶¶ 64–65). After Williams' report, Taylor began to spread rumors that Williams was romantically involved with another welder. (Id. ¶ 66). Williams again reported the behavior to Dale, who assured her he would discuss it with Human Resources. (Id. ¶ 67). Dale later reported back that a Human Resources representative named Kate Bayer had responded to the report by asking, in a rhetorical and dismissive manner, "what do you want me to do about it?" (Id. ¶ 68).

Fearing Human Resources would not help her, Williams escalated her complaints about Taylor's harassment to Albert Hewitt, Plant Superintendent. (Id. ¶ 69). Beginning in or around October 2019, Dale began to prevent Williams from working overtime hours, but allowed Williams' male colleagues to work overtime. (Id. ¶¶ 70, 72). In or around December 2019, Williams showed Dale the anti-harassment policy on Ellicott's bulletin board. (Id. ¶ 73). Although Dale again said he would talk to Taylor, there was no indication he did so. (Id. ¶ 74).

In January 2020, Williams again reported Taylor's behavior to Bayer. (Id. ¶ 75). To Williams' knowledge, Bayer took no action in response. (Id.). In February 2020, Williams escalated her complaints to Ben Sumpter, Chief Executive Officer. (Id. ¶ 76). She told Sumpter about Taylor's inappropriate comments and conduct, Keener's threatening and harassing behavior, and Dale's "continued targeting of her." (Id.). Although Sumpter assured Williams he would end the mistreatment, "the harassment and discrimination continued." (Id. ¶ 77).

Williams then met with Hewitt and Sumpter to discuss Dale's unwarranted scrutiny and criticism of her welding. (Id. ¶ 78). She showed them a picture of a weld she completed, and they agreed it was an excellent weld. (Id.). She also showed them a picture of a coworker's weld, which was worse than hers, but which Thomas found acceptable. (Id. ¶ 79). Sumpter told Williams he would initiate an investigation into Dale. (Id. ¶ 80). Sumpter circulated a survey about Dale to his subordinates, but otherwise took no action. (Id. ¶ 81). After the survey, Dale increased his scrutiny and targeting of Williams, including

making daily critiques of her welding work. (Id. ¶ 82). In March 2020, Ellicott terminated Williams' employment. (Id. ¶ 88).

Throughout Williams' employment, Ellicott lacked a designated women's restroom for Williams to use. (Id. ¶ 84). Instead, she used a handicapped bathroom that was also used by men. (Id.). In fact, two male welders had their lockers in the restroom. (Id. ¶ 86). The only other female welder at Ellicott informed Williams that she had complained about the lack of a women's restroom and that the men were using the handicapped bathroom and defecating on the toilet and floor. (Id. ¶ 85). Williams also witnessed these conditions and was forced to clean the restroom before she could use it. (Id. ¶ 86). Williams' coworkers also informed her that men were able to see into the restroom the women used via a hole in the ceiling. (Id. ¶ 87).

**B.    Procedural History**

Williams filed charges of sex- and race-based discrimination and harassment and retaliation with the Equal Employment Opportunity Commission on or about March 23, 2020. (Compl. ¶ 8). After receiving notice of her right to sue, Williams filed this lawsuit against Defendants Ellicott Dredges, LLC, Markel Corporation, and Markel Ventures, Inc. on May 24, 2021. (ECF No. 1). On August 27, 2021, Williams filed a Notice to Dismiss Markel Ventures, Inc. and Markel Corporation (collectively, "Markel") Without Prejudice (ECF No. 5). The Court approved the Notice and dismissed Markel on September 7, 2021. (ECF No. 8).

Williams' fifteen-count Complaint alleges: harassment based on sex in violation of Baltimore County Code § 29-2-201 et seq. ("BCC § 201") (Count I); harassment on the

basis of race in violation of BCC § 201 (Count II); discrimination on the basis of sex in violation of BCC § 201 (Count III); discrimination on the basis of race in violation of Baltimore County Code § 29-2-202 (Count IV); retaliation in violation of BCC § 201 (Count V); harassment based on sex in violation of Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-601 et seq. ("FEPA") (Count VI); harassment based on race in violation of FEPA (Count VII); discrimination on the basis of race in violation of FEPA (Count VIII); discrimination on the basis of sex in violation of FEPA (Count IX); retaliation in violation of FEPA (Count X); harassment based on sex in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a) ("Title VII") (Count XI); harassment based on race in violation of Title VII (Count XII); discrimination on the basis of sex in violation of Title VII (Count XIII); discrimination on the basis of race in violation of Title VII (Count XIV); and retaliation in violation of Title VII (Count XV). (Compl. ¶¶ 93–247). Williams seeks declaratory and injunctive relief, payment of past and future lost wages, compensatory damages, punitive damages, attorneys' fees and costs, and prejudgment interest. (Id. at 33).

      Ellicott filed the instant Partial Motion to Dismiss on September 23, 2021. (ECF No. 6). The Motion seeks dismissal of Counts I, II, III, IV, V, VII, VIII, IX, XII, XIII, and XIV. (Mem. Law Supp. Def.'s Partial Mot. Dismiss Pl.'s Compl. ["Mot."] at 1–2, ECF No. 6). On October 1, 2021, Williams filed an Opposition (ECF No. 12), along with a Notice of Dismissal Without Prejudice of Counts I–V of the Complaint (ECF No. 13). Ellicott filed a Reply on October 14, 2021. (ECF No. 14).

## II. DISCUSSION

### A. Standard of Review

The purpose of a Rule 12(b)(6) motion is to "test[] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of Am., N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, accept the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. See Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs of Davidson Cnty., 407 F.3d 266, 268 (4th Cir. 2005). But the court need not accept unsupported or conclusory factual allegations devoid

of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

**B.      Analysis**

Ellicott makes three arguments in its Motion: (1) Ellicott is not an "employer" as defined in the Baltimore County Code; (2) the Complaint does not state a plausible claim of race-based harassment; and (3) the Complaint does not allege sufficient facts to support Williams' claims of sex- and race-based discrimination. (Mot. at 5, 6, 9). The Court will analyze each argument in turn.

### 1. Baltimore County Code Claims

Ellicott first argues that Counts I–V of the Complaint are subject to dismissal because Ellicott Dredges is not an "employer" within the meaning of the Baltimore County Code. (Mot. at 5). Williams does not challenge this argument and instead withdraws those Counts. (See Mem. Law Supp. Pl.'s Opp'n Def.'s Partial Mot. Dismiss ["Opp'n] at 2, ECF No. 12; Pl.'s Notice Dismissal Without Prejudice Counts I-V Compl. at 1, ECF No. 13). Accordingly, the Court will dismiss Counts I–V.

### 2. Race-Based Harassment

Counts VII and XII of the Complaint allege harassment based on race.[3] "Title VII prohibits an employer from discriminating against an employee because of race or sex."

---

[3] Count VII alleges race-based harassment under FEPA, while Count XII alleges race-based harassment under Title VII. "FEPA is the state law analogue of Title VII and its interpretation is guided by federal cases interpreting Title VII." Finkle v. Howard Cnty., 12 F.Supp.3d 780, 784 (D.Md. 2014) (citing Haas v. Lockheed Martin Corp., 914 A.2d

Cepada v. Bd. of Educ., 814 F.Supp.2d 500, 509 (D.Md. 2011); see 42 U.S.C. § 2000e-2(a)(1). To establish a claim of harassment, i.e., a discriminatory hostile work environment, Williams "must demonstrate: (1) she experienced unwelcome harassment; (2) the harassment was based on her . . . race; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." Evans v. Int'l Paper Co., 936 F.3d 183, 192 (4th Cir. 2019). Ellicott argues that Williams has failed to plausibly allege the second element, i.e., that any harassment she endured was related to her race. (Mot. at 6–10). At bottom, the Court disagrees and will allow Williams' race-based harassment claims to survive.

To establish that unwelcome conduct was based on race, a plaintiff must sufficiently plead that "but for" her race, she "would not have been the victim of the alleged discrimination." Cepada, 814 F.Supp.2d at 511 (quoting Gilliam v. S.C. Dep't of Juv. Just., 474 F.3d 134, 142 (4th Cir. 2007)). Racial animosity can be shown by "direct evidence of discrimination, or differential treatment of similarly situated" non-minority employees. McNeil v. Loyola Univ., No. WDQ-13-1473, 2014 WL 320494, at *9 (D.Md. Jan. 27, 2014). "Direct evidence is 'evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.'" Cole v. Fam. Dollar Stores of Md., Inc., 811 F.App'x 168, 175 (4th Cir. 2020) (quoting Taylor v. Va. Union Univ., 193 F.3d 219, 232 (4th Cir. 1999)).

---

735, 742 (Md. 2007)). The Court will therefore apply its Title VII analysis to Williams' FEPA claims.

Here, Williams does not allege direct evidence of discrimination. Instead, she argues that the Complaint includes allegations of differential treatment of similarly situated non-Black employees. (See Opp'n at 8 ("Plaintiff alleged that Dale Thomas targeted . . . her because she was a Black woman and treated her worse than both male welders and white welders . . . . Dale Thomas required Plaintiff to take numerous weld tests, that white (male) welders were not required to take.")). But an examination of the paragraphs Williams cites in support of this reveals no specifics regarding the race of the individuals who were allegedly treated better than her. (See Compl. ¶¶ 27, 29–37, 40, 44–45, 47, 71–72, 82–83, 88–89). To the extent these paragraphs do make specific mention of race, they contain only generalized allegations of her treatment compared with white male welders. (See, e.g., id. ¶ 25 (alleging that in conjunction with Williams' October 2018 termination, Don "retained lesser qualified white males"); ¶ 27 (alleging that Dale "treat[ed] [Williams] differently than the white welders and male welders"); ¶ 89 (alleging that "similarly-situated white employees were not terminated at the same time as Ms. Williams").[4]

The Complaint specifically identifies only two Ellicott employees as non-Black: Dick and Keener. (See id. ¶¶ 22a, 50). However, Williams' race-based harassment claims specifically reference the harassment she endured by Keener, a white man, and Ellicott's

---

[4] The Court notes, however, that while the Complaint could be clearer with respect to the races of her welder comparators, these repeated, generalized allegations suggest that several of Williams' similarly situated and differently treated welder colleagues are white. In light of that ambiguity, even if the Court were inclined to dismiss Williams' harassment claims on the basis that she failed to specifically identify similarly situated comparators, it would do so without prejudice and would allow Williams to amend her Complaint to clarify the issue. Because the Court will allow Williams' race-based harassment claim to survive for other reasons, it will not require her to amend the Complaint.

11

failure to take meaningful steps to remedy the harassment. (See id. ¶¶ 168–71, 220–23). Thus, Williams has alleged that Ellicott treated her differently than her white colleague—it ignored her complaints while permitting her white coworker to continue harassing her unabated. As to whether Keener is similarly situated to Williams, such "questions are inherently fact-based and should not be resolved at the pleadings stage where [Plaintiff] has alleged enough facts to permit a plausible inference that" her harassment was rooted in her race. Hisp. Nat'l L. Enf't Ass'n NCR v. Prince George's Cnty., No. TDC-18-3821, 2019 WL 2929025, at *15 (D.Md. July 8, 2019); see also Mandell v. Cnty. of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003) (holding that "the question whether two employees are similarly situated is a question of fact for the jury"); Subasic v. Sharon Reg'l Health Sys., No. 2:15-CV-1477, 2016 WL 861122, at *3 (W.D.Pa. Mar. 7, 2016) ("Whether or not the [employees outside Plaintiff's protected class] were working in another department or division . . . , or whether that is even relevant to the inquiry, raises factual questions as to whether they are, in fact, similarly situated, which cannot be resolved at the motion to dismiss stage.").

The Court further notes that in a recent decision, it allowed a Title VII hostile work environment claim to survive a motion to dismiss based on allegations that an employer failed to take remedial action in response to reports of harassment. See Powell v. Susdewitt Mgmt., LLC, No. CCB-20-2343, 2021 WL 4420999, at *6 (D.Md. Sept. 27, 2021).[5]

---

[5] The Fourth Circuit has similarly referenced the value of such evidence in a hostile work environment claim. See Conner v. Schrader-Bridgeport Int'l, Inc., 227 F.3d 179, 197 (4th Cir. 2000) (citing an Eighth Circuit decision for the proposition that "managers' failure to respond to complaints added to hostile environment").

Further, this Court has found that the causation element of a hostile work environment claim may be premised on a defendant's failure to investigate. See Westmoreland v. Prince George's Cnty., No. AW-09-2453, 2011 WL 3880422, at *6 (D.Md. Aug. 31, 2011). The Court thus concludes that Williams' race-based harassment claims adequately allege that the unwelcome treatment she experienced was based on her race. Accordingly, the Court will deny Ellicott's Motion as to Counts VII and XII.

### 3. Sex and Race Discrimination

Counts VIII, IX, XIII and XIV of the Complaint allege sex- and race-based discrimination in violation of Title VII and FEPA. Title VII, after which FEPA is modeled, prohibits an employer from discriminating against "any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race . . . [or] sex." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a Title VII claim "either 'through direct and indirect evidence of retaliatory [or discriminatory] animus,' or through a burden-shifting 'pretext' framework." Netter v. Barnes, 908 F.3d 932, 938 (4th Cir. 2018) (quoting Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 249 (4th Cir. 2015)). Williams does not allege direct evidence of discrimination; accordingly, the Court will evaluate her claims under the burden-shifting framework first articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

To establish a discrimination claim under the McDonnell Douglas burden-shifting framework, Williams must eventually put forth a prima facie case of discrimination by establishing that "(1) [s]he belongs to a protected class; (2) [s]he suffered an adverse employment action; (3) at the time of the adverse action, [s]he was performing his job at a

level that met [her] employer's legitimate expectations and was qualified for the promotion; and (4) [s]he was rejected under circumstances giving rise to an inference of unlawful discrimination." Adams v. Trs. of the Univ. of N.C.-Wilmington, 640 F.3d 550, 558 (4th Cir. 2011); see McDonnell Douglas, 411 U.S. at 802. The fourth element can be met by showing that "similarly-situated employees outside the protected class received more favorable treatment." White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004).

Once the plaintiff meets his initial burden of establishing a prima facie case for discrimination, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc), abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338 (2013). Once the employer meets this burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons 'were not its true reasons, but were a pretext for discrimination.'" Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)). "The final pretext inquiry 'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination,' which at all times remains with the plaintiff." Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 294 (4th Cir. 2010) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)).

In an employment discrimination action, however, "[t]he prima facie case . . . is an evidentiary standard, not a pleading requirement." Swierkiewicz v. Sorema N.A., 534 U.S.

506, 510 (2002). Thus, a plaintiff need not plead facts that constitute a prima facie case to survive a motion to dismiss. Bing v. Brivo Sys., LLC, 959 F.3d 605, 616 (4th Cir. 2020). The factual allegations must only be sufficient "to satisfy the elements of a cause of action created by" Title VII, McCleary-Evans v. Md. Dep't of Transp., 780 F.3d 582, 585 (4th Cir. 2015), and raise the plaintiff's "right to relief above the speculative level," Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010). Ultimately, a plaintiff is required to show that the employer took an adverse action against the plaintiff "under circumstances which give rise to an inference of unlawful discrimination." Burdine, 450 U.S. at 253.

Here, Ellicott does not dispute that Williams, a Black woman, is a member of a protected class, nor does it dispute that Williams' termination constituted an adverse employment action. Rather, Ellicott argues that Williams has failed to satisfy the third and fourth elements of her prima facie case, i.e., that she failed to allege facts showing that (1) similarly situated non-Black or male employees were treated more favorably, or (2) she was performing her job at a level that met Ellicott's legitimate expectations. At bottom, the Court disagrees and will deny Ellicott's Motion to the extent it seeks dismissal of these claims.

Employees are similarly situated when they "dealt with the same supervisor, [were] subject to the same standards . . . and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Haywood v. Locke, 387 F.App'x 355, 359 (4th Cir. 2010) (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)). But an employment discrimination plaintiff "is not required as a matter of law to point to a

15

similarly situated white comparator in order to succeed on a race discrimination claim." Bryant v. Aiken Reg'l Med. Ctrs. Inc., 333 F.3d 536, 545 (4th Cir. 2003). Moreover, as the Court notes above, questions about the suitability of comparators "are inherently fact-based and should not be resolved at the pleadings stage where [Plaintiff] has alleged enough facts to permit a plausible inference that" she experienced discrimination. Hisp. Nat'l, 2019 WL 2929025, at *15.

As set forth supra in Section II.B.2, the Complaint is short on detail with respect to comparators. But while "Plaintiff's allegations as to comparators are not always presented in detail," "at this stage in the litigation, the allegations 'plausibly state a violation of Title VII above a speculative level.'" Prosa v. Austin, No. ELH-20-3015, 2022 WL 394465, at *28 (D.Md. Feb. 8, 2022) (quoting Bing, 959 F.3d at 617) (cleaned up). Accordingly, the Court rejects Ellicott's argument that Williams failed to satisfy the fourth element of her prima facie case.

As to whether Williams was meeting the legitimate expectations of her employer, the Court does not view this as a close question. Williams was employed as a welder. The Complaint is replete with allegations that Williams' colleagues viewed her as a competent and effective welder. (See, e.g., Compl. ¶¶ 30–32 (describing how Williams passed her first weld test and approximately six more tests after that); ¶ 35 (alleging that Matt Pratt, Ellicott's only certified weld test examiner at the time, evaluated some of Williams' welding tests and informed her that according to his standards, she passed those tests); ¶¶ 41–42 (alleging that when Dale critiqued a weld Williams performed, two coworkers insisted it had been done correctly); ¶ 78 (describing a meeting with Hewitt and Sumpter

16

in which Williams showed them a picture of a weld she completed, "and they agreed it was an excellent weld")). These allegations are more than sufficient at the pleading stage to allege that Williams was meeting Ellicott's legitimate expectations. The Court therefore also rejects Ellicott's argument that Williams failed to satisfy the third element of her prima facie case. Finding that Ellicott has failed to identify any fatal deficiency in Williams' claims of sex and race discrimination, the Court will deny Ellicott's Motion as to Counts VIII, IX, XIII and XIV of the Complaint.

### III.  CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Defendant Ellicott Dredges, LLC's Partial Motion to Dismiss Plaintiff's Complaint (ECF No. 6). The Court will grant the Motion to the extent it seeks dismissal of Counts I, II, III, IV, and V. The Court will deny the Motion to the extent it seeks dismissal of Counts VII, VIII, IX, XII, XIII, and XIV. A separate Order follows.

Entered this 6th day of June, 2022.

　　　　　　　　　　　　　　　　　　　　　　　／s／
　　　　　　　　　　　　　　　　　　　　George L. Russell, III
　　　　　　　　　　　　　　　　　　　　United States District Judge